**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. '12 - CV - 00482

Diana Lee Farrah_____, Plaintiff,
v.
Colorado Coalition for the Homeless, Defendant.

| COMPLAINT |
|---|

Plaintiff Diana Farrah submits this complaint for violations of her rights under of the American Recovery and Reinvestment Act of 2009, Section 1553, (Public Law 111-5).

**PARTIES**

1.  Plaintiff  Diana Lee Farrah is a citizen of Denver, Denver County, CO., US, and was a citizen of the United States at all relevant times, who presently resides at the following address:
    2965 Fairfax Street, Denver, CO 80207

2.  Defendant Colorado Coalition for the Homeless is a nonprofit headquartered in Denver, Denver County, CO., which operates exclusively in the United States and located at the following address:
    2111 Champa Street, Denver, CO 80205

| JURISDICTION |
|---|

4. Jurisdiction is asserted pursuant to following statutory authorities: American Recovery and Reinvestment Act of 2009 Article 4, Protecting Sate and Local Government and Contractor Whistleblowers Under Section 1553 of the American Recovery and Reinvestment Act of 2009, (Public Law 111-5). [ARRA]

5. Farrah's administrative process under ARRA has been exhausted.  Plaintiff filed a complaint with the Housing and Urban Development Office of Inspector General [HUD OIG] on July 31, 2010. Under Secton 1553 (c) (3) states: "CIVIL ACTION— If the head of any agency issues an order denying relief in whole or in part under paragraph (1), has not issued an order within 210 days after the submission of a complaint under subsection (b), or in the case of an extension of time under subsection (b)(2)(b)(i), within 30 days after the expiration of the extension of time, or decides under subsection (b)(3) not to investigate or to discontinue an investigation, and there is no showing that such delay or decision is due to the bad faith of the

complainant, the complainant shall be deemed to have exhausted all administrative remedies with respect to the complaint, and the complainant may bring a de novo action at law or equity against the employer to seek compensatory damages and other relief available under this section in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy. Such an action shall, at the request of either party to the action, be tried by the court with a jury."

6. The HUD OIG has taken no action that Plaintiff is aware of about her complaint.

7. Plaintiff entered into a Settlement Agreement [Agreement] with the Defendant on December 22, 2010 to settle various employment-related claims actionable at local, state and federal level [discrimination based upon marital status and age discrimination].

8. Per Section 1553 (c) (5) (d) "NONENFORCEABILITY OF CERTAIN PROVISION WAIVING RIGHTS AND REMEDIES OR REQUIRING ARBITRATION OF DISPUTES.—(1) WAIVER OF RIGHTS AND REMEDIES.—except as provided under paragraph (3) the rights and remedies provided for in this section may not be waived by any agreement, policy, form, or condition of employment, including any predispute arbitration agreement."

9. Plaintiff's Agreement does not abrogate her rights under ARRA Section 1553.

## NATURE OF THE CASE

10. Plaintiff was a grant accountant for about 18 million in covered funds [ARRA funds] and Temporary Assistance for Needy Families [TANF] and Supportive Housing Program [SHP] non-ARRA funds from September 1, 2009 through October 1, 2010. There were approximately 23 subgrantees and over 30 contracts related to the grants.

11. Plaintiff was retaliated against in violation of Sections 1553 of the ARRA for disclosing to persons with supervisory authority over the Plaintiff evidence of (a)(5) a violation of a law, rule, or regulations related to an agency contract (including the competition for or negotiation of a contract) or grant, awarded or issued relating to covered funds; (a)(4) an abuse of authority related to the implementation or use of covered funds; and (a)(3) a substantial and specific danger to public health or safety related to the implementation or used of covered funds.

12. Plaintiff made the following disclosures to John Parvensky [President], President of the Colorado Coalition for the Homeless: [1] Around March, that the Senior Accountant/Manager [CCC] had not been obtaining subgrantee annual audits in accordance with the White House Office of Management and Budget [OMB] Regulation A-133. [2] Around April/May, she told the President the Assistant

Controller [BBB] was not complying with grant terms.   [3] Plaintiff asked the Senior Vice President [SVP] why Colorado Coalition for the Homeless [CCH] had not had a fire drill in almost a year.  [4] Plaintiff disclosed to the President that the subgrantee audits performed by CCC were likely not in compliance with A-133.  [5] Plaintiff disclosed to the President that she was being discriminated against by BBB and CCC for being single.

13. Following disclosures [1] and [2] around March/April/May, both BBB and CCC began to harass, bully, mob, sabotage, and psychologically batter the plaintiff. Plaintiff was subjected to disparate treatment, arbitrary and capricious standards, and excessively harsh discipline.  In June, Plaintiff received a written warning after CCC sabotaged Plaintiff's work; the Director of Human Resources, the Controller [AAA] and BBB attempted to force Farrah to resign.  On October 1, 2010, Plaintiff was laid off [per the Agreement between Plaintiff and CCH].

14. Farrah suffered mentally and physically because of the abuse, harassment, retaliation, discrimination, and psychological battering she endured over the months.  Farrah's mild depression turned into severe depression; she had suicidal ideation.  Farrah was taking medication for sleep; she started to take up to five and six times the prescribed amount and was still unable to sleep.  She suffered headaches and stomach aches. She suffered post-traumatic stress syndrome.  She began suffering musculo-skeletal pain in her legs; and she has been in constant pain since her employment at CCH.

15. Management refused to hire adequate staff for grant administration.  Plaintiff was expected to work unpaid hours in excess of the typical 40-hourwork week in order to meet grant-stipulated deadlines because she was single.  Her supervisor, BBB, explicitly excused CCC from working beyond the 40-hour work week because she [CCC] was married.

16. The processing volume for the grants steadily increased and processing was frenzied. Eventually two additional processors were hired full-time; a temporary had been hired for a week or two,  three employees assisted with vendor input, and one to two employees assisted on a part-time basis with filing.  The total number of vendors at CCH doubled within several months, and the total number of checks being issued monthly exceeded what had been CCH's normal volume before the ARRA grants. Farrah worked on back-logs and clean-up until her final day on October 1, 2010, and the back-logs and clean up were still unfinished as of that day.

17. Other departments also suffered due to management's refusal to hire adequate staff. The programs area also had back-logs in phone calls and file maintenance that took months to clean up.  The information system also encountered problems that required clean up efforts.  These efforts also extended beyond Plantiff's final day with CCH.

18. In all, the ARRA and TANF effort was a fiasco across all departments involved and at all levels involved due to management's refusal to hire adequate staff.

## FACTS

A. Plaintiff made disclosures of violations to John Parvensky [President], President of the Colorado Coalition for the Homeless, around March and April of 2010 that the Accountant III/Manager [CCC] had not been complying with White House Office of Management and Budget Circular A-133 [A-133] about subgrantee monitoring. Around March 2010, Farrah disclosed to the President the necessity for additional personnel needed to service increasing volume. Around the same time, Plaintiff disclosed to the President that the Assistant Controller [BBB] was trying to refuse to process payments for lack of funds. Around May 2010, Farrah sent a memorandum to the Pres, the Senior Vice President of Programs [SVPP], the Senior Vice President of Operations [SVPO], the Controller [AAA] and the BBB stating that payments and grant reporting had been late due to the actions of BBB.

B. CCH's stated reason for Farrah's layoff, reports weren't tying out, is pretext for the retaliation and discrimination against Farrah for her disclosures of regulatory violations and noncompliance with grant terms to management. Any error in the reports cannot possibly be the reason for Farrah's lay off because management routinely accepted all of the following as satisfactory or above satisfactory job performance: numerous errors of all kinds, lack of accounting knowledge, lack of regulatory knowledge, untimely performance of job duties, and behavioral problems.

C. CCH's stated reasons for other discriminatory and retaliatory adverse actions against Farrah cannot possibly be the true reasons for the adverse actions because management routinely accepted all of the following as satisfactory or above satisfactory job performance: numerous errors of all kinds, lack of accounting knowledge, lack of regulatory knowledge, untimely performance of job duties, and behavioral problems.

D. The terms and conditions of Farrah's employment were different because of the discrimination and retaliation.

E. BBB deliberately used tactics to cause psychological destabilization, such as withholding information from Farrah, giving Farrah incorrect instructions, and obstructing and sabotaging Farrah's work efforts.

19. CCH had accepted a role of lead agency for administering the ARRA, TANF, and SHP grants totaling about 18 million out of about 29 million in total federal grants. CCH, in accepting this role, had told grantors that it would be able to issue checks for subgrantees within a 48-72 time frame and would provide guidance to subgrantees on technical issues.

20. Farrah, a Certified Public Accountant and Certified Internal Auditor, managed ARRA, TANF, and SHP grants. Per grant terms for ARRA and TANF, checks were to be issued within 48-72 hours of receipt of the check request. Monthly reports were due on the 5th and 15th for the ARRA and TANF grants; Quarterly performance reports for were due on the 5th for the ARRA grants. The SHP report could be submitted quarterly. Farrah had approximately two years of non-profit experience before joining CCH; she had also performed A-133 Single Audits.

21. The Assistant Controller [BBB] has no accounting degree and it was readily apparent to Farrah that she [BBB] had never read or studied any grant-related regulations. BBB had been promoted to Assistant Controller after being manager of the accounting function for CCH's property management company.

22. The Accountant III/Manager [CCC] is a Certified Public Accountant who had no non-profit experience before her employment with CCH commenced around December, 2008. When Farrah and CCC performed some subgrantee visits shortly after Farrah was employed by CCH, it was readily apparent to Farrah that CCC had never read A-133 or the Compliance Supplement.

23. The Controller [AAA] allowed his public accounting license to lapse.

24. Farrah's three-month evaluation was very positive; she received compliments from CCC, who described her as "very knowledgeable," from the payroll clerk, and from the Accounting Manager over CCH's property accounting department.

25. Within about four months of starting employment with CCH, Farrah met with Daniel Casso in the Human Resources Department to find out when she would be eligible for a transfer out of the department.

26. BBB became instantly enraged in response to a question Farrah had about a check and exclaimed angrily, "I'll just run [or roll] right over you!!" This comment is direct evidence of BBB's intent toward Farrah.

27. BBB and CCC began harassing, bullying, mobbing, and psychological battering Farrah after she disclosed to the President [around March or April] that CCC had not been performing subgrantee monitoring in accordance with A-133 and that BBB was obstructing federal program objectives and not complying with grant terms by causing late payments and late reporting. BBB and CCC also obstructed and sabotaged Farrah's work efforts.

28. Around April 2010, BBB began obstructing the check runs if the check run was large [around $80,000] exclaiming loudly, "We don't have that kind of money!!" Farrah then asked the President if CCH had a borrowing facility and let him know that BBB was obstructing the check process because of a purported lack of funds.

29. Around April, BBB refused to issue a check run while the Program Director was attending a conference, even though the SVPP was available to approve and sign the checks. BBB simply sat on the checks until the Program Director returned.

30. Then BBB submitted the stack of check requests in complete disarray to the Program Director about 6 inches thick. Both Farrah and the Program Director had to clean up the mess created by BBB and re-match all of the loose documentation.

31. Around April, BBB called Farrah into AAA's office to tell her that an offage of 38 cents between Farrah's billing and what the grantor had paid [the grantor's error] was very important and that "every penny counts."

32. Around April, Farrah had to repeatedly reorder check requests that BBB had caused to be in disarray. Farrah would organize all of the documents, and then BBB would take the stacks, separate all the documents, and cause a mess. Then Farrah would have to reorder the documents.

33. Around April or May, Farrah stayed late on Friday. BBB and CCC stopped by her desk before they left for the day. BBB said Farrah could leave some of the work Farrah was doing on her [BBB's] desk. Then BBB snidely said, "It won't get done, but you can leave it on my desk."

34. Beginning around April 2010, whenever the grant reports were due [5th and 15th] of the month], BBB would run reports on different dates than Farrah's standard system reports and repeatedly accuse Farrah of producing incorrect reports. BBB refused to view the standard system reports produced by Farrah. Farrah had to sit with BBB and determine why BBB's reports were different from Farrah's standard system reports. Usually the differences amounted to several dollars. BBB, after harassing Farrah, typically had no revisions to the reports and would sign the reports. This harassment over the reports continued every month twice a month until Farrah's final day.

35. BBB never ran ad hoc reports when reviewing other grant reports, nor did she refuse to look at the attached standard reports.

36. BBB's review of other grant reports was cursory; Farrah observed that the pages were typically undisturbed as if straight off the copier.

37. IN an attempt to force errors, BBB instructed Farrah to discontinue her [Farrah's] method of tying out the reports. Farrah had been using a rigorous tie-out method used by public accountants until BBB instructed her to discontinue the practice.

38. BBB refused to listen to Farrah's explanation of the tie out methodology.

39. BBB would lose pages from Farrah's reports. BBB would return the approved reports to Farrah less whatever report page(s) had been misplaced by BBB. Farrah

had to search BBB's desk for the missing pages or reproduce the missing pages. If a signature page was missing, Farrah had to get BBB to sign another copy.

40. Farrah attempted to simplify the review process for BBB by color coding the report balances; BBB did not like that. Farrah then used arrows and pointers in the spreadsheets; BBB did not like that. No method Farrah attempted would satisfy BBB, and BBB offered no instructions to Farrah that might make the review process easier for BBB.

41. BBB attempted to force Farrah to submit the reports late, insisting that Farrah had to wait until the CCH books were closed before submitting the reports. The books were never closed before the end of the month, and Farrah's reports were due on the 5th and 15th of each month. Farrah told BBB that the reports were due the 5th and 15th and that was when she was going to submit them.

42. Shortly before Farrah was to submit a report of $107,000 for City and County of Denver [C/C Denver] due on the April 15th to the C/C Denver, BBB removed all of the report documents that were in order in Farrah's lateral file and caused them to be in disarray about the office. Farrah completed the report and most of the copying for the report. Farrah was unable to locate all of the documents before she left for the evening to take a planned and approved 5 days off. The report was submitted late after Farrah returned from vacation.

43. BBB did nothing to mitigate the tardiness of the report by having other accounting personnel finish the copying and email the report.

44. Farrah had worked 51.75, 65.50, 56.50, the prior 3 weeks when the report was due and 41.50 hours in the 4 days prior to the due date of the report. She had regularly worked excess unpaid hours since around January 2010. Farrah was too exhausted to stay; she was angry over BBB's sabotage of her [Farrah's] files and the mess BBB made of the documents.

45. There were 9 other employees in the accounting department who rarely worked overtime who could have finished the copying and emailed the report while Farrah was out. No other accounting personnel were working extra hours similar to Farrah.

46. The other employees' positions seemed unusually and perfectly calibrated to reach eight hours per day.

47. Shortly before she left for vacation in mid-May, Farrah informed Controller [AAA] and BBB that she was going to seek a transfer out of the accounting department.

48. On May 18th, Farrah submitted the April SHP grant report of about $11,000 to CCC to process. CCC would request funds from HUD via phone. The report had already been reviewed and approved by BBB and initialed/dated by BBB. Farrah submitted

the report shortly before she left for a planned and approved vacation through the 27th, later extended through the 31st of May.

49. Rather than requesting the funds from HUD, CCC returned the report to Farrah's desk where it sat until Farrah returned from vacation. CCC returned the report because she was supposedly confused over a small amount in the adjustment column [~ $400.00].

50. There was no justification for CCC to have refused to call HUD for the funds. Previously, the adjustment columns in use by Farrah had never been questioned by CCC.

51. On June 22, 2010, Farrah was given a written warning for submitting the SHP grant late.

52. The written warning retroactively changed a conversation that Farrah had had with BBB in April about various matters in the Accounting Department to a verbal warning. In that conversation, BBB had very briefly talked about the C/C Denver report, and Farrah and BBB had talked about ongoing problems with, for example, W-9 forms, that were no fault of Farrah's.

53. At no time during the conversation referenced in #52 above did BBB mention any concerns about Farrah's performance; BBB used no words to the effect that Farrah's performance was at issue nor did she use any synonyms of such words. If Farrah had been told such, she would have immediately documented the problems created by BBB when BBB removed all of the report documents from Farrah's file cabinet.

54. BBB concocted a policy expressly for the purpose of reprimanding Farrah with the written warning. Farrah had emailed a suggestion to the Program Director and to BBB. BBB was already performing much of the suggestion. BBB said that Farrah should have emailed the suggestion only to BBB. The fact that Farrah also emailed the suggestion to the Program Director caused "inefficiency" and "confusion."

55. Farrah was unaware of any policy/practice as concocted and cited by BBB in #54 above until the moment that BBB cited the practice/policy.

56. Farrah was cited for quoting BBB in an email. The email was innocuous. BBB had become enraged and impatient with program personnel and very loudly exclaimed, "This is a bunch of b.s.!!" right outside of Farrah's cube where anyone could hear her.

57. Farrah had emailed "I asked Jan about getting the approval; she then said I should approve it, then said this was a bunch of bs and took the form to Ros. She says she does not need to see the leases." When BBB saw the email, she became enraged. BBB printed the email and stomped over to Farrah's desk in a fury and very forcefully threw it on Farrah's desk in front of her face.

58. BBB wrote in the warning that she had expected her comment to be kept confidential, despite the reality of her having said it so loudly that other employees on the 2nd floor could easily hear BBB.

59. BBB asserted in the written warning that documents were missing for a report. In 2011, Farrah submitted a Colorado Open Records Request [CORA] to the agencies to obtain all of Cache's submissions. There were no additional submissions that would have indicated that missing documents were supplied to the recipients of the report.

60. One check, comprising maybe 3 pages out of an 800+ page submission had not been included.

61. In an attempt to force errors, BBB had previously instructed Farrah to not double check the checks against the system reports before finalizing the report because BBB did not want Farrah to spend time on that task; rather, Farrah was only to copy what she had and submit the copies.

62. BBB had caused numerous documents to be in disarray throughout the department because she refused to keep check requests and supporting documentation intact upon receipt. She took boxes of loose documentation home to re-match. It is unknown if all of the documents were returned to CCH or if they were appropriately re-matched.

63. When Farrah responded to the written warning, she said that BBB had caused the problem with the C/C Denver report, that CCC had never previously had problems with adjustment columns in Farrah's spreadsheets and that CCC should have requested the funds from HUD anyway, that she was unaware of any policy that prohibited emailed suggestions to anyone, and that she was unaware that the conversation in April comprised a verbal warning.

64. When Farrah met with the Director of Human Resources [DHR], AAA and BBB, they tried to force Farrah to resign immediately. AAA began berating Farrah loudly, repeatedly demanding, "What are you going to do!? What are you going to do!?" BBB addressed Farrah in a loud, snide, contemptuous tone throughout the meeting.

65. In June, when Farrah submitted the May SHP grant report to the CCC for processing, CCC refused to process the report, stating that Farrah had turned in the report too early.

66. In July or August, Farrah gave the reports to AAA for review because BBB was on vacation. Farrah submitted them to AAA two days prior to due date. The day the reports were due, Farrah asked AAA if he was finished reviewing the reports. He expressed surprise that they were due and said he had intended to leave them until BBB returned from vacation so that she could review them. This incident indicates AAA's complete lack of concern or even knowledge of the deadlines for the report.

67. Farrah was blamed for CCC's tardiness in posting revenue. BBB and CCC verbally reprimanded Farrah, stating that it was Farrah's fault that CCC had not posted revenue in a timely manner, even though CCC knew where all the reports were, both electronically and physically.

68. Farrah was blamed for BBB's errors in posting payroll adjustments. BBB trained Farrah on posting payroll adjustments in February 2010. This entry was incorrectly computed and posted by BBB and was not caught by the payroll clerk until around August 2010. BBB then blamed Farrah for the error, even though it was computed and posted by BBB and had BBB's userid on the transaction.

69. Farrah was repeatedly harassed by BBB about computer sign-ons. BBB repeatedly accused Farrah of not signing off. BBB repeatedly called Farrah to her [BBB's] desk to show Farrah how she supposedly had not signed off. Farrah did not observe multiple sign-ins for herself, but noted that several other employees were signed on multiple times. BBB did not harass these employees similarly to Farrah.

70. BBB would stomp over to Farrah's desk in a rage about the sign off issue.

71. Around June/July, the SVPO gave BBB and CCC instructions to compute allocations to the ARRA and TANF grants. BBB and CCC both deliberately dawdled with the task over a week, deliberately toying about getting it done even though Farrah's report deadlines were approaching.

72. BBB and CCC knew the report deadlines and deliberately dawdled with the task in order to cause Farrah distress. CCC kept saying that she was too confused to complete the task "I'm confused….. I'm confused," she repeated several times. CCC did not get the allocations posted until around 5pm the day that Farrah's reports were due.

73. Both BBB and CCC knew how exhausted Farrah was because Farrah had told them. Also, around April, Farrah told BBB that she [Farrah] took prescription drugs to help her sleep. Farrah told CCC around April that she thought it was abusive that CCH expected her to work so much. So, both BBB and CCC were well aware of the impact of the stress upon Farrah's health when they began toying around with the task of posting allocations.

74. BBB accused Farrah of ordering a bank report that Farrah had not ordered.

75. BBB accused Farrah of 'intimidating' her. Farrah was called into AAA's office and BBB said she did not like the way Farrah made her feel in a petulant, pouting tone. Farrah asked BBB to describe what Farrah had done and BBB was unable to describe any behavior that led to her 'intimidation.'

76. BBB accused Farrah of incorrectly processing a subgrantee reimbursement request. BBB did not bother to look at Farrah's note where she evidenced a disallowed cost; rather BBB asserted that the check was incorrect.

77. Around July/August, 2010, Farrah commented to BBB that she [Farrah] was beginning to see the light at the end of the tunnel. BBB immediately developed an additional superfluous spreadsheet for Farrah in order to increase Farrah's workload. Farrah had been using the standard spreadsheet in use by the department. BBB's new spreadsheet used a horizontal axis for inputting the data instead of the vertical axis on the standard spreadsheet already in use. The new spreadsheet was duplicative and unnecessary. When BBB reviewed the reports for this cycle, BBB exclaimed at least once that, "This shouldn't be so difficult!"

78. CCC stalked Farrah around the office when BBB was on vacation. Whenever Farrah left her desk, CCC would follow her wherever she went [except for the bathroom]. If other employees came to discuss matters with Farrah, CCC would immediately come over to Farrah's desk, fold her arms over her chest, and stare at Farrah with hostility until the employee left.

79. AAA tossed documents at Farrah instead of handing them to her; Farrah had to chase the documents as they fell to the floor.

80. An additional person was hired around April to assist Farrah with the increasing volume. When Farrah trained this person, BBB would then come over and contradict Farrah's instructions without informing Farrah of any changes BBB was implementing.

81. Farrah returned from a non-profit conference and told BBB that she had talked with a forensic accountant about how to detect fraud related to rent payments. BBB became instantly enraged over the conversation. When CCC told BBB that she had talked to her former co-workers about internal controls, BBB did not become similarly enraged. When a different employee said that she had talked with a forensic accountant in her class, BBB did not become similarly enraged.

82. Farrah was excluded from meetings and set up for failure. Around July 2010, BBB decided to address internal controls about various processes. Farrah was excluded from the meetings with the process owners. Farrah was then called into meetings and expected to suggest internal controls for those processes without even knowing the specifics of the particular processes.

83. In an effort to isolate Farrah and deny her normal human interaction, BBB did not want Farrah to attend the monthly ARRA meetings and Farrah ceased attending these meetings. BBB told Farrah that she was to have "nothing to do" with the two employees who processed the ARRA payments.

84. BBB would glare on different occasions at Farrah; CCC ceased speaking to Farrah except for the snide comments she [CCC] made to Farrah. When Farrah arrived in the morning, AAA would not even say 'good morning' while he continued to say 'good morning' to other employees. Farrah was frozen out of normal human interactions.

85. Both BBB and CCC deliberately withheld information from Farrah. Farrah's SHP grant had matching fund requirements; the regulations stated that the match could be recorded at the end of the year. CCH's practice was to record matching funds on a monthly basis; however, Farrah did not learn of this practice until around July of 2010, months after she should have been told about CCH's practice.

86. BBB deliberately gave Farrah incorrect instructions. Around April, BBB had been forcefully and loudly adamant that the expense for background criminal checks on potential tenants was not an allowable grant expense; around August, BBB then decided that she had no idea about the expenses and told Farrah to check with the President about the issue.

87. BBB deliberately gave Farrah incorrect instructions about rural personnel charges to the rural TANF grants. In response to Farrah's questions, BBB insisted on at least three occasions that no rural personnel charges should be charged to the rural TANF grants. The Pres then called Farrah into his office to find out why no payroll charges had been allocated to the rural TANF grants. Farrah told him that BBB had instructed her not to charge these expenses. Farrah also told him that BBB had created numerous general ledger accounts for the rural grants that were incorrect.

88. BBB kept insisting to Farrah that the subgrantee monitoring was not a responsibility of the accounting department. BBB said this several times to Farrah individually and during a meeting about subgrantee monitoring with the Program Director and several other personnel, demonstrating her lack of knowledge of A-133..

89. Around August, BBB became enraged about employees' time cards and stomped over to Farrah's desk waving the time cards in Farrah's face while loudly calling out Farrah's name, "Diana!!" and exclaiming that the time cards were incorrect. BBB was mistaken about the time cards.

90. Around August, BBB gave Farrah contradictory instructions. First, BBB told Farrah to keep the actual to budget comparisons up to date frequently; then BBB later became angry and told Farrah that she [Farrah] was updating the information too frequently.

91. BBB kept telling Farrah that she [BBB] or CCC were going to work on a schedule to separate disbursements by grant. BBB said a report would easily provide this information. This task was never completed.

92. In order to force errors related to the cash flow spreadsheet, BBB changed processes without informing Farrah. BBB began running checks before month end without informing Farrah in order to keep Farrah from keeping the cash flow spreadsheet current.

93. BBB would lock the check register in her cabinet, preventing Farrah from documenting evidence of quality control review and entry into the cash flow spreadsheet on the face of the check register.

94. Throughout the time frame referenced, CCC made multiple snide comments to Farrah that served no purpose other than to distress Farrah. For example, CCC told Farrah contemptuously that she [CCC] should be supervising Farrah, even though the AAA expressly stated that CCC was not Farrah's supervisor. All of the snide comments served no business purpose.

95. Even after AAA had told BBB and Farrah that CCC was not Farrah's supervisor, BBB told CCC to review one of Farrah's grant billings.

96. Around March, April and May, BBB explicitly excused CCC from working over forty hours per week because of CCC's marital status. CCC was married; Farrah was single. BBB explicitly stated, "CCC's married" on multiple occasions. On at least two occasions, CCC was present for these comments and wholeheartedly agreed with the BBB that she [CCC] should not have to work over 40 hours per week because of her marital status. CCC commented that she hated to work weekends.

97. CCC was excused from working more than 40 hours a week while Farrah was expected to work over 40 hours per week in order to meet grant-stipulated reporting and processing deadlines. Farrah also had to work additional hours because of backlogged quality control reviews and other cleanup tasks.

98. BBB repeatedly changed the procedures for submitting reports to C/C Denver, creating confusion for Farrah over what she was supposed to do.

99. BBB told Farrah that she was to work closely with two additional employees hired to assist with processes, then later told Farrah that she was to have "nothing to do with" these employees.

100.    Farrah emailed BBB to ask for clarification about her job duties because BBB kept changing procedures without telling Farrah about the changes; BBB never responded.

101.    AAA and BBB rushed into Farrah's cube one day and dug through her cabinets and the documents on her desk without looking at Farrah, without acknowledging her presence or letting her know what they were looking for.

102.   On different occasions, BBB would come to Farrah's desk, dig around in Farrah's in box without acknowledging or looking at Farrah and without telling Farrah what she was looking for.

103.   Around June, BBB began repeatedly announcing during staff meetings and around the department that Farrah was going to get "slammed" by the auditors. "Diana's going to get slammed by the auditors!" "Diana's going to get slammed by the auditors!" she said over and over. BBB even said it during CCC's going away party.

104.   Around July, BBB was talking and smiling with CCC and Farrah walked up and waited to address BBB. When BBB turned her gaze to Farrah, she instantaneously ceased smiling and glared with pure hatred at Farrah.

105.   Around July 2010, the President announced bonuses and raises for all employees who were in "good standing." Farrah then found out that she was not in good standing. The written warning was retroactively changed verbally by BBB. BBB said that Farrah was on probation and that the effective date of the written warning was now September 22, 2010. Farrah had not been told that she was on probation or that she was not in good standing when she met with DHR, AAA and BBB in June. The written warning contains no statement about the altered standing of Farrah nor are any effective dates mentioned.

106.   Farrah would ask BBB to quality control review her journal entries before posting; BBB typically refused.

107.   Around August, the President failed to communicate to rural program personnel or accounting personnel an exception to the boundaries for rural, thus affecting the general ledger code structure. Adjustments to the general ledger had to be made, and Farrah was blamed by the President and BBB for the President's failure.

108.   Around September, the President wrote a negative email about Farrah, stating concern that she had told a grantor who had not yet issued a reimbursement that CCH 'needs the funds' and that she had disseminated other 'confidential' information.

109.   Farrah used the exact same language that BBB had used in March or April when BBB called grantors about payments and told them that CCH needs the funds. When an official from the Colorado Department of Local Affairs visited around March or April, he received formal requests for advances from Farrah in the President's presence because CCH needed the funds.

110.   The President's email cited 'confidential' information; Farrah and the President had discussed the potential reallocation of grant funds from a subgrantee to CCH. It is common knowledge in the federal grant world that if subgrantees are not expending the grant funds, the funds may be reallocated to other subgrantees that will expend the

funds. Furthermore, a program employee told Farrah that the President had discussed the information during a staff meeting.

111.   BBB also wrote an email citing Farrah for releasing 'confidential' information to subgrantees. The information was the summary of CCH's grant expenditures. This information is widely available on government websites. This incident further demonstrated BBB's lack of knowledge about federal grants.

112.   Around September, Farrah was talking with a co-worker when AAA leaned over a filing cabinet toward Farrah, slammed his hand down loudly on the cabinet, then slowly dragged his hand back to himself over the cabinet, all while saying nothing and staring at Farrah.

113.   Farrah was overwhelmed by fear; she never knew when she was going to be reprimanded or harassed. She became hyper vigilant, redoing work, in a constant state of anxiety. She did not know what was expected of her because BBB never told her anything besides whatever it was that Farrah did, it was wrong. Farrah felt completely helpless to stop the harassment.

114.   The sleep medication did not work. Farrah had been exhausted since March; however, the abuse that commenced around that time worsened her exhausted state and prevented any recovery. Even when Farrah comped out time, she was unable to recover from the exhaustion.

115.   Around September, Farrah avoided ordinary conversations with coworkers because she was so fearful of being reprimanded. Farrah never knew when BBB would stomp over to her desk in a rage or fly into a rage upon a question. Farrah went into a frozen fearful and numb state, afraid to ask questions, afraid to talk to anyone, afraid to email anyone. She did tell a program employee that she felt she was in complete bondage to BBB, a slave to BBB, and that BBB could do anything she wanted to do to Farrah.

116.   Around August/September, BBB repeatedly announced to Farrah that she was going to let one of the non-permanent employees go because BBB said that the department was caught up. Farrah told BBB that she was still cleaning up problems and that the TANF recurring payment errors by BBB were another back-log project that needed to be fixed.

117.   In September, after BBB left Farrah's desk, she [Farrah] began crying due to the exhaustion and because there was so much clean up and back log to finish. In particular, BBB had caused about $100,000 errors in overcharges to the TANF grants that should have been charged to another grant and Farrah was anticipating another clean up project.

118.   After the exchange with BBB, Farrah emailed the President and told him she would no longer work additional hours in excess of the 40 hour work week. She also told the President that she had been discriminated against because of her single status.

119.   AAA called Farrah into his office to reprimand her for the email to the President. The DHR was also present. AAA said he would always find out if Farrah had emailed President and that she should not be "airing" the accounting department's "dirty laundry" to the President in an apparent admission that Farrah had been discriminated against due to her marital status.

120.   Farrah was laid off on October 1, 2010, per the  Agreement entered into between Farrah and CCH on December 22, 2010.  BBB said in the final meeting that Farrah's reports were not tying out.

121.   BBB, in an attempt to humiliate Farrah as much as possible, placed the adverse information about Farrah on the system queue where any employee at CCH could see the information.  Apparently, other employees knew that October 1 was Farrah's final day even before she knew.

122.   Farrah was in a completely exhausted state by her final day at CCH.   She suffered post-traumatic stress disorder. She had ceased dreaming if she slept. She had ceased cleaning her house or doing yard work. She had ceased exercising. She had ceased volunteer activities.   She did not clean her house again until April of 2011. She did not start dreaming normally, and then only intermittently, until August of 2011. She has trouble concentrating and her ability to absorb and recall new information seems impaired. She has been in constant musculoskeletal pain since her employment.

123.   BBB later informed accounting department personnel that Farrah had been making errors.

124.   Farrah attempted the appeal process as stated in the Personnel Manual.  She immediately requested of the DHR and the President to be provided the information that supported CCC's decision.   The President refused to provide Farrah the information.

125.   Farrah met with the President and DHR to appeal CCC's decision. The President told Farrah to "make your case." It was impossible for Farrah to make any case against CCC's decision since she had no access to the information.

126.   Farrah later requested that the Board of Directors provide to her the information that CCC developed. The Board never responded to the request.

127.   Farrah, through the Colorado Open Records Act, requested all of the reports that had been submitted by CCH to the grantors. There was nothing in the reports that

indicated any amendments had been submitted, nor were there any documents that had been submitted after Farrah's original submissions.

128. Farrah filed a compliant of retaliation with the HUD Office of Inspector General [HUD OIG] OIG around August 1, 2010. No action has been taken by the HUD OIG, and the 210 day deadline for HUD OIG action will be passed upon filing this complaint with the U.S. District Court.

**F. CCH management routinely accepted all of the following as satisfactory or above satisfactory job performance: numerous errors of all kinds, lack of accounting knowledge, lack of regulatory knowledge, untimely performance of job duties, and behavioral problems.**

129. The SVP did not get around to performing indirect and direct cost allocations for the ARRA and TANF grants until months after these grants were incurring costs.

130. Neither AAA nor BBB are able to produce accurate financial statements. During 2010, there were multiple roll-forwards [corrections] of 2009 year-end balances due to errors in final account balances.

131. The AAA and BBB are unable to produce accurate financial statements for the annual report. The 2010 annual report contains errors in the A-133 Single Audit report pages, likely more than $100,000 in dollar volume.

132. Neither the President, SVP, AAA, nor BBB were able to accurately review the ARRA nor TANF reports submitted by Farrah, because none of them caught the tie-out errors that Farrah supposedly made.

133. Neither AAA, BBB, nor CCC knew how to accurately record some accounting transactions, such as promises to give and unearned income. BBB wanted to record cash advances as negative accounts receivable.

134. Neither AAA, BBB, nor CCC was aware of A-133 subgrantee monitoring provisions nor were they aware of the Compliance Supplement to A-133. Until Farrah's employment at CCH, the Accounting Department did not even have any reference material related to A-133 or accounting pronouncements.

135. Errors are a source of much mirth and merriment in the Accounting Department. AAA frequently joked about how things were so "screwed up," chuckling as he commented. AAA chuckled and laughed as he told CCC about a schedule she had prepared that was not prepared correctly. AAA had to re-work the schedule. AAA laughed about a general ledger entry he prepared; he told BBB, as he laughed, that he was too afraid to work on it anymore because he was afraid that he would "screw it up" even more. Shortly before Farrah's last day, AAA was laughing about how "things are so screwed up," and how he hadn't even done anything yet, and things

were "screwed up." BBB would call out in a loud voice so that the entire department could hear, "Everyone makes mistakes!" when she made mistakes.

136.   BBB did not perform critical job functions in a timely manner. She did not establish the cross-year reports for Farrah's grants until months after expenses were being incurred. She did not establish a set of general ledger codes for TANF Balance of State grants until well after expenses were incurred, creating a back-log project for Farrah to clean up. BBB did not perform employee evaluations in a timely manner. She did not review reconciliations by the payroll clerk or by CCC in a timely manner. BBB did not keep the cash flow spreadsheet updated when Farrah was on vacation. BBB did not post allocations in a timely manner, causing Farrah's reports to be late. BBB did not post adjustments in a timely manner, causing Farrah's reports to be late. BBB did not process void checks in a timely manner, rather she hoarded documents for several months and would dump the untimely documents on Farrah's desk for processing.

137.   BBB caused hundreds of errors, creating many hours of clean up for Farrah. BBB input general ledger codes incorrectly; BBB input duplicate vendors; BBB didn't input checks timely [in accordance with grant terms] when she offered to do the processing; BBB incorrectly processed payroll transactions; BBB incorrectly computed payroll allocations; BBB incorrectly ran check runs, spoiling numerous checks and causing mismatches between the physical check number and the system check number; she coded check requests incorrectly; BBB completely missed the monthly rent payments for two subgrantees in one month; BBB repeatedly reactivated incorrect codes causing more clean-up work for Farrah; BBB did not input check runs into the cash flow spreadsheet or she input into the wrong cash flow spreadsheet; BBB did not follow her own procedures for voiding checks or documenting adjustments to the general ledger; BBB processed recurring checks incorrectly and overcharged a TANF grant for a likely six-figure amount over several months, creating another clean-up project. BBB had previously caught several overcharges to TANF grants but ceased doing so when she took over the recurring payment process.

138.   BBB discontinued a control Farrah had implemented to prevent duplicate payments [also called "improper payments" per A-133]. The cessation of the control caused numerous duplicated and even triplicate payments and many duplicated/triplicated/quadrupled copies of check requests, resulting in more research, clean-up, and back-log efforts for Farrah.

139.   BBB did not keep documentation intact, rather, she spread documents all over her desk and other work areas, commingling documents with other processing. Because of this practice, Farrah and two other employees had to spend hours researching all of the loose documentation to determine if/when it had been processed. Farrah also had to repeatedly re-order documents for subgrantees recurring payments because BBB would repeatedly take what Farrah had clipped together, unclip them, and commingle the documents on her desk with other documents, restarting the whole cycle of cleaning up the messes created by BBB.

140.   BBB took at least two boxes of loose documentation home to re-match. It is unknown if everything was matched appropriately or even if it was all returned to CCH.

141.   BBB further demonstrated her lack of knowledge of federal grants. BBB wrote an email citing Farrah for releasing 'confidential' information to subgrantees. The information was a summary of CCH's grant expenditures to date [a tab attached to a file that had other tabs showing the subgrantee's grant expenditures to date]. This information is widely available on government websites and is available via CORA requests.

142.   Even blatant insubordination is no reason for adverse employment action. The President told BBB while Farrah was present that BBB should establish the typical code structure for the general ledger. BBB then invented a completely different structure. The President had to call a meeting with the SVPO, AAA, BBB and Farrah in order to get BBB to comply with his instructions.

143.   The two employees hired in late April/early May made numerous errors while processing checks. Farrah was responsible for this clean up effort.

144.   After Farrah's final day with CCH, BBB was unable to produce the grant reports without the assistance of two other employees while Farrah had no assistance in producing the reports.

145.   AAA is allowed to yell at employees and at external auditors. BBB is extremely temperamental and flies into rages easily, although most of her rages were directed at Farrah.

146.   Both BBB and CCC had great difficulty grasping the notion of timing differences and realizing the impact that continuous posting would have on account balances.

147.   CCC fell several months behind in a critical job function, the reconciliation between the donor system and the accounting system. When she finally got around to performing the task, she was unable to reconcile the two systems.

148.   CCC was promoted to manager despite falling behind in a critical job function, not being able to perform the critical job function, not having performed job tasks in compliance with grant-related regulations, and making posting errors.

149.   CCC posted revenue transactions incorrectly and untimely; CCC posted other ledger entries incorrectly; CCC incorrectly reconciled the match accounts—this resulted in a roll-forward for 2009 balances in around August of 2010; CCC input duplicate vendor records; CCC incorrectly prepared the Schedule of Functional Expenses and AAA had to re-work the schedule; CCC and/or BBB did not prepare the Schedule of Federal Awards correctly for 2009 and the external auditors caught

the errors; CCC posted allocations late, causing Farrah's reports to be late; CCC missed posting allocations completely for one month.

150.   CCC was not performing the subgrantee monitoring in accordance with A-133 or the Compliance Supplement for the entire time she was employed at CCH, over 1 ½ years.   No one in management was aware of this problem until Farrah told the President about it around March.  The President then apparently told AAA to get the subgrantees' annual reports. AAA handed one report to CCC and CCC asked, "What am I supposed to do with it?"  AAA chuckled as they talked; lack of compliance and lack of job knowledge was of no concern to AAA.

151.   Around April, CCC later approached Farrah and repeatedly insisted that she [CCC] did not need to obtain subgrantees' annual audits.  Farrah had to print out the authoritative guidance, highlight the relevant section, and show it to her in order to convince CCC of her error.

152.   Around June, in a meeting about subgrantee monitoring, Farrah asked CCC if she had inquired into the subgrantees' internal controls, and she responded that she hadn't because none of the subgrantees had any internal controls, again demonstrating her [CCC's] lack of knowledge of A-133 and the Compliance Supplement.

153.   CCC was unable to review the simple SHP reports submitted by Farrah.  By CCC's own admission, CCC was confused by a small adjustment Farrah made.

154.   Around July, CCC turned in her resignation.  BBB sent at least two emails to all employees at CCH stating that CCC had performed "well above expectations."  At CCC's going away party, BBB provided a lengthy dissertation on how "wonderful" CCC was and how "blessed" the Accounting Department had been by CCC's presence.

155.   The consequences of the problems caused by AAA, BBB and CCC were potentially significant in comparison to other issues.  Their performance problems typically result in findings in the annual reports.  Not knowing how to record transactions, falling behind in reconciliations, making errors in the annual report or the Schedule of Federal Expenditures, causing duplicated [improper] payments, not complying with grant-related regulations are all issues typically cited as findings in annual reports and A-133 Single Audits.

156.   The audit company that performs the annual audit for CCH apparently does not cite findings for CCH.

157.   CCH has been ordered by HUD to refund HUD for unallowed charges to grant funds in 2003 and in the last few years, demonstrating the accounting department's lack of regulatory knowledge about allowable expenditures.

## FIRST CLAIM FOR RELIEF

Against Defendant CCH

Discrimination and retaliation against Farrah in violation of the American Recovery and Reinvestment Act of 2009.

158.    Farrah incorporates herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

159.    Farrah was managing ARRA funds for CCH.

160.    Farrah made disclosures to the President about violations of grant regulations and grant terms.   AAA, BBB, and CCC learned of these disclosures when corrective actions were taken.

161.    Defendant's discrimination and retaliation against Farrah was intentional.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

A.  a jury trial;

B.  A declaration that Farrah was retaliated against in violation of Section 1553 of ARRA;

C.  An award of costs to cover medical expenses, drug expenses, physical therapy and rehabilitative equipment;

D.  Compensatory damages;

E.  An email sent by the President to all employees of CCH and to CCC stating that Farrah's area incurred no more problems than any other area at CCH;

F.  An award of fees and costs of this action, including expert witness fees, on all claims allowed by law;

G.  Any additional or alternative relief as may be just, proper and equitable.

Dated:  February 24, 2012

Respectfully submitted,

Diana Lee Farrah, CPA, CIA pro se
2965 Fairfax Street
Denver, CO  80207
Phone:  303-748-7447
Email:  dfarrah@idcomm.com